RECEIVED
IN MONROE, LA

JUL 1 6 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

| | |
|---|---|
| **ERIC CLEVELAND, ET AL.** | **CIVIL ACTION NO. 12,924** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **UNION PARISH SCHOOL BOARD, ET AL.** | **MAG. JUDGE KAREN L. HAYES** |

### RULING

This is a school desegregation case. Union Parish School Board ("Union") currently

operates under a desegregation plan and decree entered on February 11, 1970, subject to

modifications on August 3, 1979; August 14, 2001; and July 18, 2005. The Court has been asked

again to review actions which may affect the desegregation efforts of Union.

### I.   INTRODUCTION

On May 20, 2008, D'Arbonne Woods Charter School, Inc. a/k/a D'Arbonne Woods Charter

School, a Louisiana Corporation, ("DWS") filed a Motion and Order for Leave to Intervene [Doc.

No. 6]. DWS has leased the former Rocky Branch school from Union and seeks to open a K-6

facility beginning with the 2008-2009 school year.[1]

On May 23, 2008, the Court conducted a telephone status conference with counsel for DWS

and Union to discuss the pending motion. The Court was advised by counsel that Union would not

oppose DWS's limited intervention for the purpose of attempting to obtain authorization for

operation. Following the conference, the Court issued an order permitting DWS's limited

---

[1]DWS plans to add two additional grades later to become a K-8 school.

1

intervention. [Doc. No. 8].

The Court further instructed the parties to notify the United States Department of Education, Office of Civil Rights ("OCR"), of the pending request by DWS, but OCR has not requested to intervene in this matter or made an appearance.

On the date of the status conference, DWS filed a Motion to Intervene and Motion for Authorization to Operate a Charter School in Union Parish[2] ("Motion for Authorization") [Doc. No. 9].

On June 2, 2008, Union met and, by a vote of 4-3, with 2 members absent, adopted a motion that stated, "Union Parish School Board supports D'Arbonne Woods Charter School if the Federal District Court finds it meets all legal requirements."

A evidentiary hearing was conducted by the Court on July 11, 2008.

Having been fully briefed on the legal issues and having had the benefit of the parties' evidentiary presentations, the Court is now prepared to rule. Given this Court's charge to determine if "whatever steps might be necessary" have been taken in order to eliminate racial discrimination "root and branch," the Court first reviews the prior proceedings in this case. *Green v. County Sch. Bd. of New Kent Cty, Va.*, 391 U.S. 430, 437-38 (1968).

---

[2]Although the motion requested leave to intervene as well as authorization for operation of the charter school, the Court had already granted DWS a limited intervention in this matter. DWS does not contend that it should be allowed a permissive intervention or an intervention as a matter of right for all purposes in this desegregation case, but seeks only the limited intervention already allowed to obtain authorization for the operation of the school. Therefore, the intervention issue is MOOT.

2

## II. FACTS AND PROCEDURAL HISTORY

### A. Original Order, Modifications, and Current Student Population

Union Parish is a rural parish located in north Louisiana. Geographically, the parish is

bounded on the north by the State of Arkansas, on the west by Claiborne Parish, on the east by

Morehouse Parish, on the southeast by Ouachita Parish, and on the southwest by Lincoln Parish.

According to the Louisiana State Census Data Center, the racial composition of Union Parish in

2000 was 69.8% white and 27.9% black.[3]

http://wwwprd.doa.louisiana.gov/censussf1/RaceProfile1.cfm?logrecno=0141685&name=Union%2

0Parish&geo=1&County=111. The student population (ages 4-17) in 2000 was 59.8% white and

37.4% black.[4]

http://wwwprd.doa.louisiana.gov/censussf1/Age1.cfm?logrecno=0141685&name=Union%20Parish

&geo=1&County=111

For almost 40 years, Union has operated under a desegregation decree. On May 23, 1967, a

Complaint was filed in this Court as a class action by parents of African-American students residing

in Union Parish against Union, as the "public body of the State of Louisiana charged with the duty

---

[3]The Court has received no evidence to suggest that the size or the racial composition of
the population has changed greatly in the years since the census. While evidence shows that
students have left Union to attend other schools, there is no evidence that they have actually
changed their parish of residence.

[4]The slight variation in figures may be explained by the greater than average number of
residents in Union Parish over the age of 65.
http://quickfacts.census.gov/qfd/states/22/22111.html. Union Parish was recently selected as a
Louisiana certified retirement community. *See* Jacobi, Keli, *The News Star*, "Union Parish to
receive designation as Certified Retirement Community," July 9, 2008.

of administering the schools of Union Parish"[5]; its then-President; and its then-Superintendent.

Plaintiffs alleged that they had been denied their constitutional rights by Defendants' operation of a

dual biracial school system and sought injunctive relief. Defendants responded with a Motion to

Dismiss.[6]

After a hearing[7] held on June 20, 1967, the Honorable Ben C. Dawkins, Jr., denied

Defendants' Motion to Dismiss. The Court determined that Union was operating a discriminatory

dual school system and enjoined Union from discriminating based on race or color and ordered it to

take affirmative action to "disestablish all school segregation and to eliminate the effects of the dual

school system" beginning with the 1967-68 school year. To achieve that goal, the Court detailed a

"freedom of choice" plan, based on the model decree adopted by the Fifth Circuit Court of Appeals

in *United States v. Jefferson Cty. Sch. Bd.*, 372 F.2d 836 (5th Cir. 1966).

Under the freedom of choice plan, parents were required to choose which school their child

would attend. Less than 1% of black children attended formerly white schools in Union Parish, and

no white children attended formerly black schools.

On May 27, 1968, the Supreme Court decided the cases of *Green v. County Sch. Bd. of New

Kent Cty.*, 391 U.S. 430 (1968); *Monroe v. Board of Commissioners of the City of Jackson*, 391

U.S. 450 (1968); and *Raney v. The Board of Educ. of the Gould Sch. Dist.*, 391 U.S. 443 (1968). In

---

[5]Defendants admitted in discovery that Union is the public body of the State of Louisiana charged with the duty of administering the schools in Union Parish.

[6]Defendants argued that one parent had no standing and obtained an affidavit from another parent in which she attested that she did not consent to the filing of the lawsuit.

[7]Prior to the hearing, the Court allowed additional parents of African-American children in Union Parish to intervene.

4

the *Green* line of cases, the Supreme Court reiterated that the burden of desegregation is placed on the school board, not parents. 391 U.S. at 437-38 ("School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."). While the Supreme Court did not reject the theory of freedom of choice as a potential tool to aid in desegregation, the Court did reject the use of a freedom of choice plan as the only method to achieve desegregation when the plan had been shown to be ineffective. *Id.* at 439-40 ("We do not hold that 'freedom of choice' can have no place in such a plan. We do not hold that a 'freedom-of-choice' plan might of itself be unconstitutional, although that argument has been urged upon us. Rather, all we decide today is that in desegregating a dual system a plan utilizing 'freedom of choice' is not an end in itself."); *see also Freeman v. Pitts*, 503 U.S. 467, 472 (1992) (In *Green*, "[w]e held that adoption of a freedom of choice plan does not, by itself, satisfy a school district's mandatory responsibility to eliminate all vestiges of a dual system.").

In 1968, Plaintiffs sought Court review based on the *Green* line of cases and its contention that the freedom of choice plan had failed to eliminate desegregation in Union Parish. A consolidated hearing was held on November 12, 1968, in Alexandria, Louisiana, before the judges of the Western District of Louisiana to address the question of whether freedom of choice plans entered in twenty-nine parishes must be changed to achieve adequate compliance with unitary status. On November 13, 1968, the district judges issued an "en banc" decision, concluding that it was too early to reject the "freedom of choice" plan to "reach blindly into an experimental 'grab bag.'" Thus, Union continued to operate under the freedom of choice plan.

On appeal, on May 28, 1969, the Fifth Circuit, sitting *en banc,* reversed the district courts'

decision and ordered that each school board be required to formulate a new plan to bring about

desegregation, effective September 1969. *See Hall v. St. Helena Par. Sch. Bd.*, 417 F.2d 801 (5th

Cir. 1969). The Fifth Circuit concluded:

> It is abundantly clear that freedom of choice, as presently constituted and operating in
> the Western District school districts before us, does not offer the "real prospect"
> contemplated by *Green*, and "cannot be accepted as a sufficient step to 'effectuate a
> transition' to a unitary system." 391 U.S. 430, 88 S.Ct. at 1696, 20 L.Ed.2d at
> 726-727.

> In addition the boards are required to examine other alternatives. The presence of
> other and more promising courses of action at the least may indicate lack of good
> faith by the board and place a heavy burden on the board to explain its preference for
> an apparently less effective method. *Green*, at 391 U.S. 430, 88 S.Ct. 1689, 20
> L.Ed.2d 724. If there are reasonably available other ways promising speedier and
> more effective conversion to a unitary non-racial system, freedom of choice must be
> held unacceptable.

*Id.* at 809 (citations omitted).

On remand, on June 5, 1969, the district courts of the Western District of Louisiana ordered

the affected school boards, including Union, to consult with the federal (then-named) Department of

Health, Education and Welfare, Office of Education, to develop new plans to effect desegregation.

On August 1, 1969, the Court approved a two-step plan submitted by Union. However,

Union operated under this plan only until February 11, 1970.

At that time, on motion of Union and after another hearing, the Court issued the current

Decree, pursuant to the Supreme Court's decision in *Alexander v. Holmes Cty. Bd. of Educ.*, 396

U.S. 19, 20 (1969) ("Under explicit holdings of this Court the obligation of every school district is

to terminate dual school systems at once and to operate now and hereafter only unitary schools.").

Under the February 11, 1970 Decree, Union was required to take the following remedial

6

steps, among others:

    (1)    Complete assignment of students to specific schools no later than February 1, 1970;

    (2)    Achieve as nearly as possible the specified ratio of white to black students in the schools;

    (3)    Allow teachers to remain in the classrooms for the remainder of the 1969-70 school year, but infuse those classrooms with students of the opposite race with certain limited exceptions;

    (4)    Assign faculty according to the Fifth Circuit's decision in *Singleton v. Jackson Municipal Sch. Dist.*, 419 F.2d 1211 (5th Cir. 1969)[8] (i.e., using objective, non-racial criteria);

    (5)    Submit certain reports on races of students and teachers on March 1, 1970, September 1, 1970, and on or before May 1st of each subsequent school year.

With regard to assignment of students, the February 11, 1970 Decree provided that students in the Bernice, Spearsville, and Westside (later known as Lillie) attendance zones were assigned to either Bernice or Spearsville for grades 1-2 and 8-12 and all were assigned to Westside for grades 3-7. Students in the Farmerville and Eastside attendance zones were assigned to Farmerville School for grades 1-3, Eastside School for grades 4-8, and Farmerville High School for grades 9-12. Students in the appropriate attendance zones were assigned to Downsville High School, Linville School, or Marion School for grades 1-12. Finally, students in the appropriate attendance zones were assigned to Rocky Branch Elementary for grades 1-6; however, the original order did not identify where students in the Rocky Branch attendance zones were assigned for grades 7-12.[9]

---

[8]*Singleton* was vacated in part by the Supreme Court in *Carter v. West Feliciana Par. Sch. Bd.*, 396 U.S. 226, 228 (1969), but only to the extent that the Fifth Circuit deferred desegregation of schools until the 1970-71 school year.

[9]Rocky Branch was a 1-6 facility at this time.

With regard to ratios, it appears that the Court contemplated the following percentages of black students to be assigned to each school as follows: (1) Bernice - 46%; (2) Downsville - 37%; (3) Eastside - 40%; (4) Farmerville - 40%; (5) Farmerville High - 36%; (6) Linville - 39%; (7) Marion - 48%; (8) Rocky Branch - 0%; (9) Spearsville - 58%; and Westside - 56%. There is an unidentified notation on the page regarding Rocky Branch, which states that "no negroes live anywhere near this small school."

However, the Court's remedial Decree has never been reviewed since the Supreme Court's decision in *Swann v. Charlotte-Mecklenberg Bd. of Educ.*, 402 U.S. 1 (1971) (Requiring the "eradication by affirmative action of all vestiges of segregation.").[10]

On August 3, 1979, the Honorable Tom Stagg ordered that the February 11, 1970 Decree be amended to allow reassignment of students, but no other changes were made. Pursuant to the August 3, 1979 modification, students in the Spearsville, Bernice, and Westside attendance zones were still assigned to those schools, but the grades were changed, so that the students attended either Spearsville or Bernice for grades K-3 and 9-12 and Westside for grades 4-8.

On August 14, 2001, this Court, on motion of Union, again amended the February 11, 1970 Decree to permit reassignment of students, but no other changes were made. After this modification, students in the Spearsville, Bernice, and Lillie (formerly known as Westside) attendance zones were assigned to Bernice or Spearsville School for grades K-4 and 9-12 and to Lillie for grades 5-8. The modification also permitted Farmerville Middle School (housed at the former Eastside School) to switch facilities with Farmerville Elementary.

---

[10]The fact that no review was requested is not unusual when the case was filed by individual plaintiffs, rather than the United States Department of Justice ("DOJ").

8

Most recently, in July 2005, Union filed a Motion to Amend Consent Decree with this Court seeking consolidation of its schools because of a deficit in the approximate amount of $1,000,000.00. Union provided statistics to show that the consolidation sought would result in greater desegregation of its schools. On July 18, 2005, this Court signed an Order, modifying the February 11, 1970 Decree to permit the closure of schools at Rocky Branch, Lillie, and Linville. At the time of closure, Rocky Branch's student population was almost 100% white[11], Linville High School's student population was 93% white, and Lillie School's student population was 62% black.[12] The Rocky Branch students were reassigned to Farmerville Elementary School for grades K-5 and Farmerville Junior High School for grades 6-8. The Lillie School students in grades 5-8 were reassigned to either Bernice High School or Spearsville High School. The Linville High School students were reassigned to Marion High School.

With the exception of a small increase in 2004[13], between 1998 and 2007, Union has had a steady decline in student enrollment. Following the closure of Rocky Branch, Linville, and Lillie schools, Union lost 231 students in 2006, a considerably larger number than years past, and lost an additional 147 students in 2007. [Exhibit 30].

At the time of the school closures, Union projected the following student populations and ratios:

---

[11]There were no black students, and 3 students of other races.

[12]At the time of the closures, Linville had a 30% greater white student population and Lillie had a 6% greater black population than contemplated by the February 11, 1970 Decree.

[13]Testimony at the hearing indicated that the 2004 figure included students who evacuated to North Louisiana following Hurricanes Katrina and Rita. However, those hurricanes occurred in 2005. Regardless, the 2004 figure is an anomaly from the otherwise consistent decline in students.

9

|     |                         | White | Black | Other       |
| --- | ----------------------- | ----- | ----- | ----------- |
| (1) | Marion                  | 61%   | 39%   | (1 student) |
| (2) | Farmerville Elementary  | 53.4% | 41.4% | 5.2%        |
| (3) | Farmerville Junior High | 55.7% | 40.8% | 3.5%        |
| (4) | Spearsville             | 41.2% | 55.4% | 3.4%        |
| (5) | Bernice                 | 22.8% | 63.2% | 14.0%       |

Downsville, the only other remaining school, was not directly affected by the school closures.

Following entry of this Order, the Rocky Branch Parent-Teacher Organization ("the PTO"), an unincorporated association of taxpayers and registered voters of Union Parish, and Gina LaValle, appearing individually and as the authorized representative of the PTO, filed a motion for intervention pursuant to Federal Rule of Civil Procedure 24. LaValle and the PTO objected to the closing of the Rocky Branch School on the basis that pre-clearance from DOJ was not obtained. However, the Court determined that the DOJ was not a party to the action, pre-clearance was not required, and the PTO and LaValle had no legally cognizable interest in this matter based on the loss of their neighborhood school. The Court denied their motion to intervene on September 14, 2005.

Between 2005 and 2008, no further action occurred in this case.

As of the 2007-2008 school year, the schools in Union had the following demographics:

|       |                                | **GRADES** | **STUDENTS** | | |
|-------|--------------------------------|--------|-------|--------|---------|
|       |                                |        | White | Black | Other |
| (1)   | Bernice High School            | K-12   | 9.7%  | 70.0% | 20.4%[14] |
| (2)   | Downsville High School         | K-12   | 93.9% | 5.1%  | 1.0%  |
| (3)   | Farmerville Elementary         | K-5    | 45.5% | 45.1% | 9.3%  |
| (4)   | Farmerville Junior High School | 6-8    | 49.4% | 46.1% | 4.5%  |
| (5)   | Farmerville High School        | 9-12   | 54.5% | 42.5% | 3.0%  |
| (6)   | Marion High School             | K-12   | 52.4% | 47.3% | .3%   |
| (7)   | Spearsville High School        | K-12   | 43.7% | 51.3% | 5.1%  |

Although the numbers are not exactly as predicted by Union in its July 2005 motion, all schools except Downsville, which is racially identifiable as white, and Bernice, which is racially identifiable as black, currently operate with a fairly proportionate number of black students and white students, as well as some students of other races.

Union has not requested consideration by the Court for partial or total unitary status.

## B. DWS's Formation and Prospective Enrollment [15] and Staffing

In the spring of 2006, Corletta Williams ("Williams"), the Director of Educational Research at the University of Louisiana at Monroe ("ULM"), and an instructor in educational research for ULM, began working with DWS to establish a charter school. A group of parents had formed DWS as a 501(c)(3) non-profit corporation with the name, Rocky Branch Charter School. However, at

---

[14]The race of other students in Union Parish is predominantly Hispanic with a small percentage of Asian students and one Native American.

[15]Although neither Union nor DWS can be certain of the enrollment figures and racial composition of students/potential students for the upcoming school year, the Court believes that it has been provided the most accurate information possible under the circumstances.

11

Williams's suggestion, the name was changed in October 2006 to DWS, so that "everyone in the parish knew that the school was for everyone in the parish, that it was not for just one particular portion of the Parish." See [Exhibit 31].

Under Louisiana statute, there are five types of charter schools. DWS originally sought to become a Type 1 charter school and was required to obtain approval from Union. After having been denied approval by Union,[16] DWS sought and, ultimately, obtained approval from the State Board of Secondary and Elementary Education ("BESE"), on December 7, 2007, to operate as a Type 2 charter school, according to the terms of the charter.[17] See [Exhibit 4]. According to Louisiana law, Type 2 charter schools are "independent public schools," La. Rev. Stat. 17: 3972, and any student who resides "within the state" shall be eligible to attend, as provided in the charter. See La. Rev. Stat. 17:3973(b)(ii) (Definition of Type 2 charter school). For the 2008-2009 school year, DWS has been authorized to operate as a K-6 facility with 216 students. DWS is permitted, however, to enroll up to 120%, so they can accept as many as 259 students.

DWS obtained a one-year lease of the former Rocky Branch school from Union pursuant to

---

[16]La. Rev. Stat. 17:3983A(2)(a)(i) ("Each proposal for a Type 1 . . . charter school shall first be made to the local school board with jurisdiction where the school is to be located . . . If, after review . . . the local school board denies the proposal, or if conditions placed on the proposal by the local school board . . . are not acceptable to those proposing the charter, then a proposal for a Type 2 charter school may be made to the State Board of Elementary and Secondary Education.").

[17]DWS went through the application and evaluation process two times, for the 2007-2008 school year and for the current 2008-2009 school year. Both times, DWS was evaluated by an outside consulting firm hired by the State and was recommended for approval. BESE denied DWS's application for the 2007-2008 school year. Prior to BESE's vote the second time, Representative Mike Walsworth introduced a resolution in the House, and Senator Robert Barham introduced a resolution in the Senate, both urging BESE to approve DWS's application. [Exhibit 31]. BESE approved DWS's application for the current school year.

12

La. Rev. Stat. 17:3982B, which requires a school board to lease a vacant facility to a charter school at fair market value. Williams explained that of the three schools closed in 2005 (Linville, Lillie, and Rocky Branch), Rocky Branch was the only one in good enough condition for use.

Should the Court approve DWS's Motion for Authorization, Williams testified that DWS has purchased property located approximately 1 1/10 miles from Crossroads for construction of a new school. That location is also in the southeast portion of the parish near Rocky Branch and approximately eleven (11) miles from Farmerville.

### 1.   Potential Students at DWS

Both Williams and Rochelle Gilbert ("Gilbert") testified about DWS's extensive recruitment efforts, particularly those efforts to attract minority students. Gilbert, who is African-American and an Assistant Professor of Educational Leadership at ULM, has also worked with DWS to establish an appropriate curriculum and to recruit students. She testified consistent with Williams that DWS has exhausted every medium available to recruit minority students. Their efforts included holding "intent to apply" rallies at different locations in Union Parish; manning a booth at the Taste of the Twin Cities in West Monroe; manning a table at the Farmerville Watermelon Festival last year; speaking to different organizations, such as the Lion's Club and the Chamber of Commerce; giving interviews to local newspapers and television outlets; handing out flyers in the parking lots of Wal-Marts in Ruston and Farmerville and Brookshire's in Farmerville; providing information to daycare centers; directly mailing letters to ten (10) African-American families who had expressed some interest in information about DWS; and maintaining a website with information about DWS. [Exhibit 33] (detailing complete recruitment efforts).

DWS currently has applications from 225 students. Of the applications received, DWS has

13

indicated that approximately 117 students attended Union schools last year. Specifically, DWS has indicated that the following schools would lose students:

| | | |
|---|---|---|
| (1) | Bernice | 3 students |
| (2) | Downsville | 11 students |
| (3) | Spearsville | 2 students |
| (4) | Linville (address)[18] | 1 student |
| (5) | Marion | 13 students |
| (6) | Farmerville Elementary | 87 students |

DWS has also identified fourteen (14) new kindergarten students who might attend a Union school for 2008-2009. If those students are included, there is a total loss of approximately 131 students to Union.

DWS also anticipates that eighty-six (86) students who are zoned for Union, but who attended private schools or Ouachita Parish public schools the past year, will attend DWS if allowed to do so. Those students attended the following schools:

| | | |
|---|---|---|
| (1) | Claiborne Christian Academy | 3 students |
| (2) | Union Christian Academy | 22 students |
| (3) | Northeast Baptist | 18 students |
| (4) | Ouachita Christian | 4 students |
| (5) | Our Lady of Fatima | 1 student |
| (6) | River Oaks | 1 student |
| (7) | Ouachita Parish schools | 25 students |

---

[18]Presumably, this student would be attending school at Marion.

Finally, DWS has received applications from twelve students who were home-schooled last year.

Despite DWS's recruitment efforts, its student population for 2008-2009 would be nearly all white. Of the 225 students, four are Hispanic, two are African-American, and two are bi-racial (white/black). The remainder of the students are white.

DWS continues to accept applications for its waiting list and, under state law, would use a weighted lottery system for filling remaining slots. Under the system, minority students would go into the drawing two times, but there is no assurance that additional black students will apply and, if so, whether they will be selected in the lottery.

## 2. Potential Teachers at DWS

Understandably, DWS could not be as certain about the composition of its staff because of its status. However, DWS intends to employ fourteen (14) teachers and four (4) paraprofessionals. DWS has received twenty-seven (27) applications as a result of Spring 2008 advertisements, emails to persons who visited the website, and contacts with the administration at ULM and Grambling State University. Of those applications, twenty-one (21) are from teachers, and six (6) are from paraprofessionals.

DWS has received one application from an African-American potential teacher, but she is not currently certified and will not be hired for the current year. Another African-American teacher who is certified has expressed interest in a position with DWS and is expected to apply. All other applicants are white.

Williams testified that one teacher would be coming from the Union school system.

15

### 3. Predicted Effect on Union

If DWS is authorized, Union faces the loss of up to 131 students. Farmerville Elementary will be the most directly affected school with a loss of approximately 87 students and a resulting lower percentage of white students. Marion and Downsville High Schools will also lose more than ten (10) students each.

Additionally, Union will lose Minimum Foundation Program ("MFP") funds from the State. The State provides a certain amount of MFP money for each student enrolled in a parish school. If the student was formerly enrolled in a Union school and becomes a student at DWS, then the money will follow the student to DWS. Union projects a loss of $3,752.00 of MFP funds per student, for a total of loss of $491,512.00 for 131 students or $438,984.00 for 117 students.[19] Union also expects to lose approximately $35,902.00 in federal Title I funding. Union would continue to receive its sales and ad valorem tax monies.

Finally, Union presented the testimony of Glenda Reynolds ("Reynolds"), Accountability Supervisor for Union, regarding the effect on student test scores. According to Reynolds, if the scores of students who have indicated they are attending DWS are taken out of last year's tabulation, then Union's overall score on standardized testing is 62.6.[20] That number is significant because any score below 60 is considered academically unacceptable.

## III.  Analysis

DWS properly sought to intervene in this matter pursuant to Louisiana Revised Statute

---

[19]The parties dispute whether the Court should consider all the kindergarten students a loss to Union, but, in either case, the loss to Union is substantial.

[20]With the DWS prospective students, the score was 66.1.

16

17:3991C (3), which provides that charter schools shall "[b]e subject to any court-ordered desegregation plan in effect for the city or parish school system."[21]

From the outset, the Court must be clear of its role in the authorization of any charter school which seeks to open in a school district subject to a desegregation decree. The Court is not charged with the duty to review the state statutory requirements for operation of charter schools,[22] nor is it permitted to authorize a charter school based solely on the type of education potentially available at the school. Rather, the Court's role is limited to reviewing DWS's Motion for Authorization to determine whether operation of DWS, as a public charter school, would undermine the Court's February 11, 1970 Decree, as modified, and promote resegregation. The Court expresses no view as to whether charter schools or traditional public schools offer a better quality or method of education. *See Berry v. School Dist. of City of Benton Harbor*, 56 F. Supp.2d 866, 879 (W.D. Mich. 1999) ("[T]he court's role in assessing the quality of educational programming is limited to the narrow purpose of remedying past discrimination, and the court retains no authority to impose its views of educationally superior programs not directed to that remedy.") (citing *Missouri v. Jenkins* ("Jenkins II "), 515 U.S. 70, 89 (1995)).

The Court has very little guidance in assessing the effect of a charter school, particularly a nearly one-race charter school, on desegregation efforts. Its role with regard to school boards is

---

[21]The Court notes that it appreciates the efforts of DWS and its counsel to comply with both the requirements of state law and, in its view, of federal desegregation law by seeking review prior to opening its doors.

[22]Although Union and DWS have discussed the number of "at risk" students which may attend DWS, both agree that the issue of the "at risk" population is one of state law, *see* La. Rev. Stat. 17:3991B, and that the number of "at risk" students cannot serve as a substitute for race. Thus, the number of "at risk" students to be enrolled at DWS is irrelevant to the Court's review.

17

clear: until a desegregation order is dissolved, the district court has a constitutional duty to enforce the order by scrutinizing all school board actions. *Hull v. Quitman Cty. Bd. of Educ.*, 1 F.3d 1450, 1458 (5th Cir. 1993). "The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Board of Educ. of Oklahoma City Public Schs. v. Dowell*, 498 U.S. 237, 249-250 (1991). Ultimately, the goal of the district court is to return "schools to the control of local authorities at the earliest practicable date."[23] *Freeman,* 503 U.S. at 490.

As of this date, Union has made no request for unitary status. While the Court may *sua sponte* consider a school district's unitariness, the evidence is not before the Court to make that determination. Thus, the Court retains its duty to ensure Union's compliance with its February 11, 1970 Decree, as modified, and to ensure that all steps practicable are taken to eradicate the vestiges of the biracial school system.

In its latest modification, in July 2005, the Court implicitly found that Union's actions in closing Linville, Lillie, and Rocky Branch would further the efforts of desegregation by transferring students from two identifiably white schools and one largely black school to other schools in the parish.

The Court is now faced with the question of whether opening a virtually all white public charter school at the formerly all white Rocky Branch school would undermine desegregation. The Court understands that the building was the most practical choice since it formerly housed a school

---

[23]In discharging this duty, the district court considers the Supreme Court's "*Green* factors": (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; (5) student assignments; and (6) curriculum. *Green*, 391 U.S. at 435.

and the other two schools closed in 2005 were in disrepair, but both its historical racial composition and its location are problematic.[24] The proposed school location is far removed from the greater concentration of African-American residents in Union Parish. Given the location of DWS in Rocky Branch and the historical identity of Rocky Branch Elementary as a "white" school for over thirty years, it is not surprising that DWS has had difficulty recruiting black students and teachers.

On the other hand, even under Supreme Court precedent, one-race schools are not *per se* prohibited, if they are not the result of past discrimination. *See Swann*, 402 U.S. at 26 ("[T]he existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law"; rather, there is a presumption of discrimination that may be rebutted by school authorities to show that the "racial composition is not the result of present or past discriminatory action").

With this historical and constitutional backdrop, the Court has considered the only published case which provides some relevant analysis on these issues, *Berry v. School Dist. of City of Benton Harbor*, 56 F. Supp.2d 866 (W.D. Mich. 1999). In *Berry*, the district court had jurisdiction over the Benton Harbor Area School District based on a 1971 finding that the school district engaged in *de jure* segregation. In 1974 and 1975, additional defendants were added to the case, including the State of Michigan. A remedial order was finally entered in 1981 and remained in place in 1999 when this case was filed. In the intervening years, the State had enacted legislation permitting the formation of public charter schools. However, the plaintiff, Benton Harbor Charter School ("BHCS"), was required to obtain court approval for State funding. Before granting approval, the

---

[24]The undersigned is familiar with both the geography and racial history of Union Parish, having been reared in Farmerville and having attended Union schools.

19

district court engaged in a detailed analysis of the request to determine the "potential impact state funding may have on the court's ability to remedy the defendants' past constitutional violations." *Id.* at 870.

DWS has attempted to distinguish *Berry* based on the facts that BHCS sought funding, not authority to operate, and that the State was a direct party to the action. The Court finds the case is not so readily distinguished. Although the suit was originally brought against Union and its Board President and Superintendent, Union admittedly acted as the "public body of the State of Louisiana charged with the duty of administering the schools of Union Parish." Further, the State has, by statute, required charter schools to comply with standing desegregation orders in the parishes where they wish to operate. Thus, the State invited the Court into the charter school process for the specific purpose of considering its effects on desegregation. Finally, there is no real distinction based on the issue of funding, as all parties agree that DWS, like BHCS, will receive state funding if allowed to operate (funding that would have been provided to Union for students attending its schools).

While there are some distinguishing facts between the two cases, *Berry's* analysis is instructive on whether the impact of a charter school "may be reflected in an interference with the present remedial order or in an effect on the court's ongoing ability to eliminate the vestiges of past discrimination." *Id.* at 870 (citing *Jenkins II*, 515 U.S. at 89 (1995); *Freeman*, 503 U.S. at 492.

### A. Will Authorization Undermine the Remedial Order and Promote Resegregation?

#### 1. Remedial Order

##### a. Union's Integrated Student Populations

The Court must consider both DWS's impact on Union's other schools, as well as DWS's own compliance with the February 11, 1970 Decree, as modified.

If DWS is allowed to operate, Farmerville Elementary will be most affected by the loss of students. For the 2007-2008 school year, the racial make up of students was 45.1% white, 45.5% black, 8.2% Hispanic, and 1.1% Asian. If students are allowed to attend DWS, Union expects the demographics of Farmerville Elementary will change to 38.9% white, 50.9% black, 9% Hispanic, and 1% Asian.

Additionally, changes in student population at Marion High School will decrease the white student population by approximately 2% to 50.3%. Downsville High School will lose white students as well, but its student population will remain more than 93% white.

DWS itself will operate in the old Rocky Branch facility and will maintain a racially identifiable white student and teacher population, at least for the 2008-2009 school year.

Based on the Court's modification of the Decree in 2005, authorization would undermine the remedial order by drawing white students out of more racially balanced schools in Union, while leaving behind one racially identifiable white school in Downsville and creating another in DWS. The Court also has concerns that authorization of DWS would, in some sense, condone the return of so-called "white flight" students who left Union to attend private schools, but apparently will

21

return only if there is a "white" public charter school in a "white" neighborhood.[25]

### b.    Union's Faculty Assignments

DWS has indicated that only one teacher from Union will be teaching at DWS. Therefore, the authorization of DWS would not undermine Union's faculty assignments, nor its use of objective criteria.

### c.    Other Aspects of the Remedial Order

The other aspects of the remedial order could be complied with, such as reporting requirements, and, thus do not weigh in favor of or against authorization of DWS.

### 2.    Impact on Desegregation

### a.    Loss of Funding

Union has operated under serious financial constraints for several years now. Its closure of schools in 2005 was to address a $1,000,000.00 deficit. Its efforts to persuade voters to support an increase in taxes, which would result in increased State funding have failed. Now, it is undisputed that DWS's operation would result in a loss of funds of more than $400,000.00. As Union pointed out, the loss will not be offset by a reduction in operating expenses.

It is unquestionable to this Court that the additional loss of the amount stated will significantly hamper Union's ability to meet its obligations under the February 11, 1970 Decree, as modified.

### b.    Loss of Higher Scoring Students

Union has raised concerns that the loss of the particular students to DWS will result in lower standardized scores, which could render Union schools academically unacceptable. While the Court

---

[25]DWS's purchase of land near Crossroads does not alleviate this concern.

does not discount the importance of standardized testing, the evidence showed a steady decline in test scores following the 2005 restructuring. The loss of higher-scoring students and a possible unacceptable rating can only further undermine Union's desegregation efforts. The Court is aware that these same students may choose to leave Union as a result of the Court's ruling in this matter, but the Court cannot base its decision on circumstances beyond its control or considerations which have no place in the analysis.

### c. Other Considerations

Although not part of its own February 11, 1970 Decree, the Court has also considered the factors of curriculum, diversity training, and composition of DWS's Board to the extent they may have an impact on Union's desegregation efforts. *Id.* at 871-72. The Court is satisfied, through the testimony of Williams and Gilbert and the evidence presented, with DWS's efforts to establish a culturally diverse curriculum and to ensure that students and staff at DWS receive appropriate diversity training. DWS has also appointed Gilbert to its executive board once she completes diversity training, so that there will be one African-American member.

While the Court commends DWS's efforts, these areas of consideration cannot outweigh the other detrimental effects on the remedial order and the likelihood of further resegregation.

### B. Can the Detrimental Effects be Remedied by Restrictions on DWS?

The Court has also considered whether the detrimental effects of the authorization of DWS could be adequately addressed by the imposition of restrictions. The Court concludes that they cannot. If the Court were to grant DWS's motion, the result would be a return to segregated education for students in the southeastern portion of Union Parish, as well as greater disparity in other portions of the parish.

23

## III. CONCLUSION

While the efforts of those working with DWS to bring about educational reform are commendable, the Court cannot ignore the directives of the Supreme Court and the Fifth Circuit Court of Appeals. Union has been subject to a desegregation decree for forty (40) years and has never been declared unitary in any aspect. The establishment of a virtually all-white charter school in an all-white and geographically remote area of Union Parish would undermine the February 11, 1970 Decree, as modified, and would promote resegregation.

DWS's Motion for Authorization is DENIED.

MONROE, LOUISIANA, this _____16_____ day of _____July_____, 2008.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

24