RECEIVED
USDC, WESTERN DISTRICT OF LA.
TONY R. MOORE, CLERK
DATE 5/19/09
BY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| ERIC CLEVELAND, ET AL. | CIVIL ACTION NO. 12,924 |
|---|---|
| VERSUS | JUDGE ROBERT G. JAMES |
| UNION PARISH SCHOOL BOARD, ET AL. | MAG. JUDGE KAREN L. HAYES |

## RULING

This is a school desegregation case. Union Parish School Board ("Union") currently operates under a desegregation plan and decree entered on February 11, 1970, subject to modifications on August 3, 1979; August 14, 2001; and July 18, 2005. The Court has been asked again to review actions which may affect the desegregation efforts of Union.

Currently pending before the Court is a Second Motion for Authorization to Operate a Charter School in Union Parish [Doc. No. 50] filed by D'Arbonne Woods Charter School, Inc. a/k/a D'Arbonne Woods Charter School, a Louisiana Corporation ("DWS"). For the following reasons, the motion is GRANTED.

## I. INTRODUCTION AND PROCEDURAL HISTORY

### A. Procedural History of DWS's Motions

This is the second time that DWS has applied to the Court for authorization to operate a charter school in Union Parish. DWS first applied for authorization in late May 2008, and, after briefing, the Court conducted an evidentiary hearing on July 11, 2008.

During the hearing, DWS presented testimony about its formation, its recruitment efforts in

1

the community, and its educational plans. To begin its operation, DWS had leased the former Rocky Branch school from Union.[1] The school is located in Rocky Branch in the far southeastern corner of Union Parish, a virtually all-white community. DWS presented testimony that it had received applications from 225 potential students: 4 Hispanic, 2 African-American, 2 bi-racial (white/black), and 217 white. At the conclusion of the hearing, the Court took the matter under advisement.

On July 16, 2008, the Court issued a Ruling and Order denying DWS's first Motion for Authorization.[2] *See* [Doc. Nos. 26 & 27]. In its conclusion, the Court commended the efforts of "those working with DWS to bring about educational reform," but found that the "establishment of a virtually all-white charter school in an all-white and geographically remote area of Union Parish would undermine the February 11, 1970 Decree, as modified, and would promote resegregation." [Doc. No. 26, p. 24].

In the spring of 2009, the Court learned that DWS might again seek authorization to operate a charter school in Union Parish. On March 27, 2009, the Court met with counsel for DWS and counsel for Union to discuss what additional steps DWS had taken in the year following the Court's Ruling to comply with the desegregation decree and in preparation for its second application. DWS's counsel agreed to provide the Court and Union with all pertinent materials as soon as possible prior to the April 6, 2009 meeting of Union.

---

[1] DWS later intended to build a school facility on property located approximately 1 1/10 miles from the Crossroads community, but that property was also in the southeastern part of Union Parish near Rocky Branch and approximately eleven (11) miles from Farmerville.

[2] DWS appealed the Court's denial of its first Motion for Authorization to the United States Court of Appeals for the Fifth Circuit. The appeal remains pending at this time.

DWS provided those materials, and, on April 16, 2009, filed a Second Motion for Leave to File Second Motion to Intervene and Second Motion for Authorization to Operate a Charter School in Union Parish ("Second Motion for Authorization") [Doc. No. 48]. The Court granted DWS leave to file its Second Motion to Intervene and Second Motion for Authorization [Doc. No. 49]. Subsequently, the Court granted DWS's Second Motion to Intervene [Doc. No. 52] for the sole purpose of seeking authorization for the operation of a charter school for levels kindergarten through sixth grade,[3] beginning with the 2009-2010 school year. The Court deferred consideration of DWS's Second Motion for Authorization until briefing was complete and a hearing could be conducted.

On May 18, 2009, DWS filed a motion with the Court. Under La. Rev. Stat. 17:3991C(1)(c)(l), DWS is normally required to use a lottery system to select students for admission. To comply with the desegregation decree, DWS moved the Court for an order allowing it to exempt minority applicants from the lottery. The Court granted that motion on May 19, 2009. [Doc. No. 55].

On the same day, May 19, 2009, a hearing was held. After presentation of witnesses and after conferring with counsel, the Court took DWS's Second Motion for Authorization under advisement.

Having been fully briefed on the legal issues and having had the benefit of the parties' evidentiary presentations, the Court is now prepared to rule.

**B.     Adoption by Reference of Portions of Previous Ruling**

Before addressing the substance of DWS's Second Motion for Authorization, the Court

---

[3]DWS intends to expand to include seventh and eighth grades.

3

notes that its previous Ruling [Doc. No. 26] detailed the complete history of the Union desegregation decree and modifications as of July 2008. The Court also detailed the facts about the formation of DWS. Rather than re-state the facts and procedural history, the Court ADOPTS by reference these portions of its previous Ruling. [Doc. No. 26, pp. 3-12].

### C. Most Recent Modification to Desegregation Decree

Since the Court's July 16, 2008 Ruling, there has been one additional modification to the desegregation decree. As the Court noted in its previous Ruling, Union has had a steady decline in student enrollment. That decline has continued, and, on March 2, 2009, Union filed a Motion to Amend Consent Decree, seeking an order from the Court to transfer students in grades 9-12 at Bernice High School ("Bernice") to Farmerville High School, commencing with the 2009-2010 school year. Bernice would continue to serve levels pre-kindergarten through eighth grade. In its motion, Union noted that, as of February 2009, there were only sixty-five students in grades 9-12 at Bernice. The Court granted that motion on March 3, 2009. [Doc. No. 44].

## II. FACTS

### A. Current Enrollment in Union Schools

As of March 9, 2009, the schools in Union had the following demographics:

|   | | GRADES | \_\_STUDENTS\_\_ | | | | |
|---|---|---|---|---|---|---|---|
|   | | | White | Afr. Am. | Hispanic | Asian | Natv. Am. |
| (1) | Bernice High School | K-12 | 2.4% | 75.9% | 21.8% | 0.0% | 0.0% |
| (2) | Downsville High School | K-12 | 93.6% | 4.3% | 2.3% | 0.0% | 0.0% |
| (3) | Farmerville Elementary | K-5 | 42.6% | 48.1% | 8.5% | 0.8% | 0.0% |
| (4) | Farmerville Junior High School | 6-8 | 47.7% | 45.6% | 5.6% | 1.2% | 0.0% |
| (5) | Farmerville High School | 9-12 | 54.2% | 41.5% | 3.4% | 0.6% | 0.3% |
| (6) | Marion High School | K-12 | 54.2% | 45.5% | 0.3% | 0.0% | 0.0% |
| (7) | Spearsville High School | K-12 | 45.5% | 48.0% | 6.5% | 0.0% | 0.0% |

Once grades 9-12 at Bernice High School are transferred to Farmerville High School, it appears that there will be an increase in Hispanic student percentage for the 2009-2010 school year with a resulting decrease in white and African-American student percentages. There will remain a small percentage of Asian and Native-American students.

### B.     Action by DWS Since the 2008 Hearing

At the hearing on May 19, 2009, the Court received into evidence the prior exhibits and transcript of the July 11, 2008 hearing on DWS's first Motion for Authorization. The parties and the Court agreed that DWS would limit its evidentiary presentation to the changes made by DWS since the previous hearing.[4]

DWS presented the testimony of Corletta Williams ("Williams"), the Executive Director of DWS. She testified that, following the Court's denial of DWS's first Motion for Authorization, DWS has taken actions to address the Court's concerns.

---

[4]The transcript from the July 11, 2008 hearing is currently part of the record on appeal, but the Court has a copy of that transcript, as well its own recollection of the hearing and the Ruling based on the evidence presented.

In August 2008, DWS opened an office on Smith Street in Farmerville to establish a presence in the community and to attempt to increase their minority enrollment. Additionally, at the time of the first hearing, Williams held the position of Director of Educational Research at the University of Louisiana at Monroe ("ULM"). In the fall of 2008, she tendered her resignation to ULM and has since worked full-time for DWS to establish a charter school. DWS's goal is to have 220 students when classes begin. The Type II charter granted DWS authorization for 216 students plus 20%, for a maximum capacity of 246 students. Fiscally, DWS needs a minimum of 204 students to operate.

Williams testified that DWS has engaged in the same type of extensive recruitment efforts they used the previous year. DWS has held open houses and meetings and has continued to reach out to community leaders and parents. As a result of Williams's full-time commitment, the office in Farmerville, and the efforts of volunteers, DWS has attracted a greater number of minority applicants for the 2009-2010 school year. DWS currently has applications from 297 students: 2 Native Americans, 51 African-Americans, 24 Hispanics, and 220 white students. While an application does not ensure that a student will attend DWS, Williams testified that she has obtained copies of birth certificates and social security cards from all but six applicants. The parents of those six applicants, all of whom are minorities, have not indicated that they have changed their minds, but that they cannot find their paperwork and are attempting to obtain copies through the school system or from family members.

Understandably, DWS could not be certain about the composition of its teachers and other staff because of its status. DWS has not advertised any positions, but has received three applications from African-Americans: one certified teacher applicant and two applicants for

paraprofessional or staff positions. Additionally, DWS is attempting to develop a Student Teacher/Teacher Candidate Initiative with Grambling State University to partner DWS with qualified teacher candidates from the College of Education for the fall of 2009. DWS hopes that this would provide them with high quality student teachers and would advance their future recruitment efforts. [DWS's Exh. 3].

DWS's Board of Directors is comprised of seven members, six of whom are white, and one of whom is African-American. The sole African-American member, Dr. Rochelle Gilbert, testified in the previous hearing on behalf of DWS. Dr. Gilbert, who holds the position of Assistant Professor of Educational Leadership at ULM, serves as the DWS Diversity Committee Chair and also worked with DWS to establish an appropriate curriculum and to recruit students. Members of the Board of Directors serve a three-year term.

DWS also has an Executive Committee that serves at the discretion of the Board of Directors in an advisory capacity. [DWS's Exh. 4]. The committee includes parents, community leaders, business leaders, and current/retired educators and administrators. Members of the Executive Committee are trained to serve as members of the Board of Directors. Currently, the Executive Committee is comprised of five White educators/administrators, one African-American business leader and parent, one African-American parent/grandparent, and one Hispanic business leader and parent.

Finally, DWS also addressed the Court's concern about the location of the school. The school will not be located in Rocky Branch. DWS met with representatives of Plum Creek, a timber company, about three tracts on Highway 2, all of which are closer to Farmerville, the most central and populated area of Union Parish. [DWS's Exh. 9]. Williams intends to recommend to

the Executive Board of DWS that it purchase the third tract, located at the intersection of Joe Rogers Road and Highway 2, approximately 4 ½ miles from the Farmerville city limits.[5] The school can be built and ready to operate by the beginning of the 2009-2010 school year.

### C.  Predicted Effect on Union

Union submitted its case on the written record. Superintendent Steve Dozier ("Dozier") was present and available to testify, but the parties stipulated that Dozier would testify as to the facts and statistics set forth in the memorandum submitted by Union and that those facts and statistics are accurate.

If DWS is authorized, Union estimates that it will suffer a loss of approximately $350,000.00, even after its reduces the number of teachers to account for the loss of students. In addition, Union estimates that it also expects to lose between $30,000.00 and $40,000.00 in federal Title I funds, which are used to supplement educational benefits for at-risk students. Union does not anticipate a comparable reduction in operating costs.

## III.  Analysis

DWS properly sought to intervene in this matter pursuant to Louisiana Revised Statute 17:3991C(3), which provides that charter schools shall "[b]e subject to any court-ordered desegregation plan in effect for the city or parish school system."

As was the case previously, the Court's role is limited to reviewing DWS's Second Motion for Authorization to determine whether operation of DWS, as a public charter school, would undermine the Court's February 11, 1970 Decree, as modified, and promote resegregation. In the year since DWS's last application, the Court has noted an educational trend in the

---

[5]Of the other two tracts, one is approximately six miles from Farmerville, and one is approximately eight miles from Farmerville. [DWS's Exh. 9].

development of charter schools, but the Court's authority is still limited by the dictates of desegregation law. *See Berry v. School Dist. of City of Benton Harbor*, 56 F. Supp.2d 866, 879 (W.D. Mich. 1999) ("[T]he court's role in assessing the quality of educational programming is limited to the narrow purpose of remedying past discrimination, and the court retains no authority to impose its views of educationally superior programs not directed to that remedy.") (citing *Missouri v. Jenkins* ("Jenkins II "), 515 U.S. 70, 89 (1995)).

Until a desegregation decree is dissolved, the district court has a constitutional duty to enforce the order by scrutinizing all school board actions. *Hull v. Quitman Cty. Bd. of Educ.*, 1 F.3d 1450, 1458 (5th Cir. 1993). "The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable." *Board of Educ. of Oklahoma City Public Schs. v. Dowell*, 498 U.S. 237, 249-250 (1991). Ultimately, the goal of the district court is to return "schools to the control of local authorities at the earliest practicable date."[6] *Freeman*, 503 U.S. at 490.

As of this date, Union has made no request for unitary status, and the Court lacks the evidence necessary to consider, *sua sponte*, whether Union is unitary. Thus, the Court retains its duty to ensure Union's compliance with its February 11, 1970 Decree, as modified, and to ensure that all steps practicable are taken to eradicate the vestiges of the segregated school system.

When DWS made its first application for authorization to operate, the Court was faced with the question of whether opening a virtually all-white public charter school at the formerly

---

[6]In discharging this duty, the district court considers the Supreme Court's "*Green* factors": (1) faculty and staff assignments; (2) transportation; (3) extra-curricular activities; (4) facilities; (5) student assignments; and (6) curriculum. *Green v. County Sch. Bd. of New Kent Cty, Va.*, 391 U.S. 430, 435 (1968).

all-white Rocky Branch school in a geographically remote and virtually all-white area of Union Parish would undermine desegregation. The Court determined that it would. However, those are no longer the facts. During the past year, DWS has made great strides toward enrolling a more racially balanced student population in a more central geographic location.

Nevertheless, as in its Ruling on DWS's first Motion for Authorization, the Court has considered those factors set forth in *Berry v. School Dist. of City of Benton Harbor*, 56 F. Supp.2d 866 (W.D. Mich. 1999), to determine whether the impact of DWS "may be reflected in an interference with the present remedial order or in an effect on the court's ongoing ability to eliminate the vestiges of past discrimination." *Id.* at 870 (citing *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995); *Freeman v. Pitts*, 503 U.S. 467, 492 (1992)).

### A. Will Authorization Undermine the Remedial Order and Promote Resegregation?

#### 1. Remedial Order

##### a. Union's Integrated Student Populations

The Court must consider both DWS's impact on Union's other schools, as well as DWS's own compliance with the February 11, 1970 Decree, as modified.

The Court has granted DWS's motion to exempt minority students from the lottery selection process, so all minority students who have applied will be enrolled at DWS.[7] The other students, however, will be selected by the lottery system. If DWS opens with 216 students, the school will enroll 139 white students, although 220 white students have applied.

---

[7]The Court notes that its May 19, 2009 Order allows the exemption of Hispanic, Native-American, and other racial minorities, as well as African-Americans. While the Court's previous ruling and the original desegregation decree focused on African-American students, the Court cannot ignore the significant minority Hispanic population and the diversity brought about by including those and other minority students.

10

Although DWS, Union, and the Court cannot know the exact effect on each Union school until the lottery is conducted, a review of the applications indicates that, as with the last application, Farmerville Elementary School will be most affected by the loss of white students. For the 2008-2009 school year, the racial make up of students at Farmerville Elementary School was 42.6% white, 48.1% African-American, 8.5% Hispanic, and 0.8% Asian. DWS has applications from 97 white students who attended Farmerville Elementary School during the 2008-2009 school year.[8] There are also applications from 33 African-American students and 3 Hispanic students, all of whom will be permitted to attend DWS. If all 97 white students were selected in the lottery, an unlikely if not impossible scenario, the racial demographics at Farmerville Elementary School would change, so that there is an increase in the percentage of African-American and Hispanic students, but a decrease in the percentage of white students. Even under that scenario, though, the white student population at Farmerville Elementary School is anticipated to remain at least 36.8%, a reduction of only 5.8%. It is far more likely that there will be a lesser reduction in the number of white students at Farmerville Elementary School because of the lottery selection system.

Ultimately, there will likely be some changes in the demographics at all Union schools with the greatest effect on Farmerville Elementary School.[9]

---

[8]In conducting its analysis, the Court used the DWS applications from students who actually attended Farmerville Elementary School last year because it is unclear whether students zoned for kindergarten at Farmerville Elementary School will actually attend. A cursory review of the applications reveals a number of students who might otherwise attend Farmerville Elementary School or other Union schools currently attend private school, are home-schooled, or attend school out of Union Parish.

[9]Other Union schools, such as Marion and Downsville High Schools, will also lose white students, but there is less likely to be a significant effect on the demographics at those schools.

### b. Racial Demographics of DWS Students

Based on the Court's exemption of minority students from the lottery selection process, DWS anticipates the enrollment of 2 Native Americans, 51 African-Americans, and 24 Hispanics, for a total minority student population of 77 for the 2009-2010 school year. If, as Williams anticipates, DWS opens with 220 students, the minority enrollment at DWS will be 35% or more than 1/3 of the student population.

As in 2008, authorization of DWS would still undermine the remedial order to some degree by drawing more white students out of Union schools. However, this time, DWS itself would no longer be a virtually all-white school, but would reflect, if not perfectly, a more racially balanced and diverse student population.

### c. Union's Faculty Assignments

DWS has not indicated that any teachers from Union will be teaching at DWS. Therefore, the authorization of DWS would not undermine Union's faculty assignments, nor its use of objective criteria.

### d. Other Aspects of the Remedial Order

The other aspects of the remedial order, such as reporting requirements, could be complied with and, thus, do not weigh in favor of or against authorization of DWS.

### B. Impact on Desegregation

It is undisputed that Union has operated under serious financial constraints for several years now. Its closure of schools in 2005 was to address a $1,000,000.00 deficit. Its efforts to persuade voters to support an increase in taxes, which would result in increased State funding, have failed. DWS's operation would result in a loss of funds to Union of close to $400,000.00,

which will not be offset by a reduction in operating expenses. The additional loss of this amount will hamper Union's ability to meet its obligations under the February 11, 1970 Decree, as modified.

C.  **Other Considerations**

Although not part of its own February 11, 1970 Decree, the Court has also considered the factors of curriculum, diversity training, and composition of DWS's Board and Executive Committee to the extent they may have an impact on Union's desegregation efforts. *Id.* at 871-72. The Court is satisfied with DWS's efforts to establish a culturally diverse curriculum and to ensure that students and staff at DWS receive appropriate diversity training. Additionally, DWS has appointed Gilbert to its Board, so that there is one African-American member. DWS draws its Board members from its Executive Committee, and DWS has achieved greater diversity on the Executive Committee by adding both African-American and Hispanic members.

D.  **Can the Detrimental Effects be Remedied by Restrictions on DWS?**

The Court has considered DWS's positive and negative impact on desegregation in Union Parish. While Union will suffer some detrimental effects as a result of the authorization of DWS, the Court must also consider whether those effects can be addressed by the imposition of restrictions. Based on the efforts of DWS in the past year, the Court believes that the imposition of restrictions will address its concerns.

In the past year, DWS has moved from obtaining applications from only six minority students to obtaining applications from 77 minority students. DWS has increased minority participation on both its Board and Executive Committee, and has actively sought a partnership with Grambling State University in an effort to recruit minority teachers. While the Court does

13

not discount the financial hardship that will result to Union Parish or ignore the number of white students leaving Farmerville Elementary School, the Court believes that, if certain conditions are imposed, and DWS can meet those conditions, DWS's operation will neither undermine the continuing desegregation efforts of Union nor promote resegregation.

DWS is required, by law, to comply with the desegregation decree, including the requirement that it report the racial demographics of students and teachers each year. Based on current racial demographics, the Court has determined that DWS must have a minority enrollment of 1/3 for the first year and must achieve 37.5% total minority enrollment by its third year. The Court retains authority, under the desegregation decree, to modify these figures if demographics change. Both the Court and the parties realize the difficulties in recruiting teachers, including minority teachers, to a rural parish with limited funding, but DWS must make good faith and reasonable efforts to recruit and retain minority teachers and staff. Finally, the Court recognizes the efforts of DWS to include more minority parents and business leaders on its Executive Committee. DWS must continue its reasonable and good faith efforts to include minority parents, business leaders, educators, and/or administrators as members of the Executive Committee and Board.

## III. CONCLUSION

For the reasons set forth above, DWS's Second Motion for Authorization [Doc. No. 50] is GRANTED.[10] DWS may begin operation in the 2009-2010 school year, subject to the

---

[10]DWS filed one pleading that contained both its Second Motion to Intervene and its Second Motion for Authorization. As set forth above, the Court has already granted DWS leave to intervene, but deferred ruling on the remainder of the motion until a hearing could be held. The Court now grants the remainder of the motion seeking authorization for operation of a charter school in Union Parish.

following conditions:

(1) DWS must comply with the February 11, 1970 desegregation decree and modifications in this case, including the requirement that on or before October 15th of each calendar year, DWS must submit to the Court an annual report containing (A) the enrollment by grade and race and (B) the name and race of each teacher employed for the current school year.

(2) DWS must employ a non-discriminatory hiring policy and make reasonable and good faith efforts to recruit and hire minority faculty and staff;

(3) DWS must make reasonable and good faith efforts to include minority parents, business leaders, educators, and/or administrators as members of the Executive Committee and the Board of Directors;

(4) By October 1, 2009, DWS must have a student body comprised of at least 1/3 racial minorities; and

(5) DWS must increase its minority enrollment each year, so that by the third year of operation (the 2011-2012 school year), it has a minority enrollment of 37.5%, based on current racial demographics, but subject to reconsideration.

MONROE, LOUISIANA, this 27 day of May, 2009.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE